# BERTHA GRIFFITH v. GREAT NORTHERN RAILWAY COMPANY.[1]

December 30, 1910.

Nos. 16,802—(157).

**Conflict of evidence — verdict sustained by evidence.**
Evidence *held* sufficient to sustain findings.

Action in the district court for Otter Tail county by the administratrix of the estate of William L. Griffith, deceased, to recover $5,000 for the death of her intestate. The answer alleged that deceased was injured through his own negligence. The reply was a general denial. The case was tried before Baxter, J., and a jury which returned a verdict in favor of plaintiff for $2,500. From the judgment entered pursuant to the verdict, defendant appealed. Affirmed.

*J. D. Sullivan,* for appellant.
*Donohue & Stephens* and *M. J. Daly,* for respondent.

O'BRIEN, J.

At the time of the accident, resulting in the death of William L. Griffith, he was a brakeman upon a mixed train of defendant, known as the "Pelican Rapids train." This train was to leave Fergus Falls immediately after the departure of the train known as the "Flyer," which was to arrive from the East. While awaiting the Flyer the mixed train stood heading east upon the passing track, which was north of the main track, over which the Flyer was to pass. There was a water tank at the side of the main track to the east of the station building. Between the water tank and station building a public street extended north and south. To leave this street open, the engine had been separated from the mixed train; the cars standing west and the engine east of the crossing. When the Flyer arrived from the

[1] Reported in 129 N. W. 152.

East, it was stopped for water at the tank; the result being to bring the two engines practically abreast. About this time the engineer of the Pelican Rapids train started his engine backwards to couple it to the train, and Griffith, while standing between the rails of the passing track and engaged in making some adjustment of the coupling apparatus, or adjusting something else upon the end of the car, was caught between the couplers and received mortal injuries.

There was no claim that the engine moved at an excessive rate of speed, and practically all, if not all, of the witnesses agreed that the bell was being rung during its movement. It was Griffith's duty to give the signal for the moving back of the engine to make the coupling, and the dispute in this case is whether or not he gave such signal, or whether, while he was engaged in adjusting some appliance upon the end of the car, the engine was unexpectedly and without his knowledge moved down upon him. The case was submitted to the jury upon instructions which left to them generally the questions of negligence upon the part of defendant and contributory negligence upon the part of Griffith. The jury found for the plaintiff, and that Griffith's death was the result of negligence upon the part of the engineer. Defendant moved for judgment notwithstanding the verdict, which was denied, judgment entered, and defendant appeals.

1. Counsel for defendant contends that the evidence conclusively shows that, before the engineer started the engine, Griffith, who was then standing between the main and passing tracks, gave the signal to back; that the signal was obeyed in a careful and prudent manner, so that there was no negligence shown upon the part of the defendant. As already said, the only negligence which could be claimed under the testimony is the premature movement of the engine. Our inquiry, therefore, must be directed to one question only; i. e., was there evidence sufficient to justify the jury in finding as a fact that the engine was prematurely moved back upon the train? If there was such premature movement, we have no difficulty as to plaintiff's contributory negligence; for not only might he have been absorbed in the duties he was performing, but the noise made by the engine upon the main track might well have been sufficient to have excused him from hearing the approach of the engine which caused his death.

The engineer of the Pelican Rapids (or mixed) train testified to the location about as described, and the stopping of the Flyer at the water tank; that he then got the back-up signal from the brakeman, William L. Griffith, then standing at the southwest corner of the back box car across the crossing; that he gave the signal with a lighted lantern; that witness personally took the signal, directed the fireman to ring the bell, and moved backwards. "Q. The question is, as you took the signal, immediately afterwards, what, if anything, did you see Griffith do? A. After I started to back up, I see him step in between the tracks." On cross-examination: "Q. How long did you observe Mr. Griffith from the time he gave this signal? A. I should think I got back probably forty feet; thirty or forty feet. Q. You watched him until you got back thirty or forty feet? A. Yes, sir; about a car length; that is the last I saw of him."

The fireman upon the engine testified to ringing the bell in response to the engineer's order, but did not see Griffith, and testified he could not, because he was on the other side of the engine.

The engineer upon the Flyer testified to arriving at the water tank and getting down to oil his engine, and said that after oiling the left end of the engine he went around the head of the engine, and then saw Griffith standing about twenty feet ahead of his (the Flyer's) engine and between the main and passing tracks. "Q. What was he doing? A. Giving signal to back up. Q. Did you see the signal? A. Yes, sir; I saw the signal." Witness paid no more attention to Griffith, excepting saying, "Hello, Willie," and knew nothing of the accident until after his train started to move up to the station.

The fireman upon the Flyer testified to being upon the back of the tank of his engine when it reached the water tank, and that he saw Griffith while right at the crossing give the back-up signal and walk towards the car.

We have, therefore, three witnesses whose testimony was positive that the signal was given, and if defendant's contention is sound, that this is the only evidence upon that question, and is therefore conclusive, it must be conceded that no negligence was established. As against this we have, first, the presumption that the deceased was in

the exercise of due care.   Lewis v. Chicago, St. P., M. & O. Ry. Co., 111 Minn. 509, 127 N. W. 180.   And the following:

Mrs. Bradehoft was at the time of the accident upon the depot platform or upon the sidewalk of the street between the station and water tank.   She testified that the man who was struck (Griffith) was on the car pounding something, and that his back was toward the engine.   She testified upon cross-examination that it was about five o'clock and broad daylight, and, further: "Q. Did you see that man go in there between those cars?   A. No.   Q. He was there before you got there?   A. He was there before I got there.   Q. Now, when you got there, was this Pelican Rapids engine standing still, or was it moving?   A. No; it was standing still when we got there. Q. First, when you saw it, it was standing still?   A. Yes, sir.   Q. It had been uncoupled, and the end of the freight train, where this man was standing or working, as you say, was on one side of the crossing, and the engine and tender was down the track towards the tank across the crossing?   A. Yes, sir.   Q. Now, after you stood there awhile, you say that Pelican Rapids engine commenced to move—to back up?   A. Yes, sir.   Q. The bell was ringing?   A. Yes, sir. Q. You heard that ringing?   A. Yes, sir.   Q. And it backed up across the crossing, to where this man was, and pinched him between the tender and the freight train?   A. Yes, sir.   Q. Now, there was not anything to prevent that man from seeing across the crossing to see that backing up, was there, if he had looked?   A. No.   Q. There wasn't any teams passing back and forth?   A. No."

Miss Kort, upon behalf of the plaintiff, testified to practically the same effect: "And you were there before the engine started to back? A. Yes, sir.   Q. During all that five minutes was Griffith with his back toward the Pelican engine?   A. Yes, sir.   Q. And fixing that car?   A. Yes, sir."

Ole Linner, amongst other things, said: "A. And when we got as far as up to the sidewalk we met Mrs. Bradehoft, and we stopped there and talked with her for about five minutes or so, and then the Pelican Flyer come backing up.   Q. The Pelican Flyer, or the Pelican engine?   A. The Pelican engine.   And Mr. Griffith, he was fixing there on the box car.   I don't know if it was a hammer or

a monkey wrench he had in his hands there, I could not say.   He was fixing there, and was turning his back east to the engine; and there was no signal or anything given to the engine there that I could see.

"Mr. Sullivan: I move to have stricken out what was not done. State what was done.   The Court: Yes; tell what was done."

On cross-examination: "Q. Now, just as soon as the Flyer came in and commenced to take water, or about that time, the Pelican Rapids engine and tender commenced to back over the crossing and couple up again; is that right?   A. Yes, sir.   Q. Did you see Griffith go in there?   A. No; he was in there before we got there?   Q. When you noticed him first, he was in there at the end of the freight car?   A. Yes, sir.   Q. Then you saw in a very short time afterwards the engine and tender commenced to back up, and kept backing up until it squeezed him together?   A. Yes, sir.   Q. That is the way it happened?   A. Yes, sir.   Q. The bell of the Pelican Rapids engine was ringing?   A. Yes, sir; ringing on both of them.   Q. You say there was no signals given—you don't know what happened before Griffith went in there?   A. No.   Q. You don't know what kind of signal he gave the engineer, or whether he gave any signal, before he went in there, or know anything about that?   A. No, sir."

Amelia Bradehoft testified upon cross-examination as follows: "Q. Now, Griffith was in between the tracks when you first saw him, was he?   A. Yes, sir.   *   *   *   Q. You did not see him go in there?   A. No.   Q. You don't know what he did before he went in there?   A. No, sir.   Q. You don't know whether he gave any signal to the engineer or not?   A. No, sir.   Q. The first you saw of him, he was in between the tracks doing something at the end of the box car?   A. Yes, sir.   Q. Then the Pelican Rapids engine commenced to back up?   A. Yes, sir.   Q. The bell was ringing?   A. Yes, sir; on both engines."

This witness and one of the other witnesses also testified that the engineer was not looking in the direction in which his engine was moving.

The engineer testified upon cross-examination: "A. There was a hammer laying beside the car.   Whether he had it, or somebody

else, or how it come there, I don't know, but it was laying alongside of the car."

We have quoted thus fully from the testimony in the case because counsel for defendant argues with much force and earnestness that the testimony of these witnesses called by the plaintiff does not contradict the positive testimony of the trainmen that Griffith gave the signal to back up; that the witnesses for the plaintiff did not arrive at their point of observation until after Griffith had given the signal and gone upon the track.

But we do not think this claim can be sustained. The engineer upon the Pelican Rapids engine claimed that Griffith was outside of the tracks when he gave the signal, and that after he started the engine back he saw Griffith step in between the tracks, and that he continued to see Griffith while his engine was moving some thirty feet. The witnesses for the plaintiff testified that Griffith was at the car hammering upon it with some implement before the engine commenced to back. It seems to us that there is a direct conflict in the evidence, and that the testimony of the witnesses for the plaintiff, taken in connection with the presumption that Griffith was in the exercise of due care, the finding of the hammer by the car, showing some unusual work, and the noise incident to the arrival of the Flyer, made this fairly a case for the jury to say whether the accident happened by reason of the premature backing of the engine, and also as to Griffith's own negligence. A simple manner of testing the soundness of this conclusion would be to imagine the case to have been submitted upon the testimony offered by the plaintiff. In such event it seems to us that there would be no question that the jury would be justified in finding negligence upon the part of the engineer; and, if that is true, how can it be said that, because three witnesses gave a different version of the transaction, the defendant has, therefore, conclusively rebutted the inference which could be fairly drawn from the testimony of plaintiff's witnesses.

It is, beyond all doubt, a case in which reasonable men might draw

different conclusions from the testimony presented, and was, therefore, properly submitted to the jury for determination.

Judgment affirmed.